(C. D. 1910)

Baron Tube Co.
John S. James } *v.* United States

United States Customs Court, Second Division

(Decided August 22, 1957)

*Sharretts, Paley & Carter* (*Joseph F. Donohue* of counsel) for the plaintiffs.
*George Cochran Doub*, Assistant Attorney General (*Dorothy C. Bennett* and *Joseph E. Weil*, trial attorneys), for the defendant.

Before Lawrence, Rao, and Ford, Judges; Lawrence, J.,
concurring in part and dissenting in part

Rao, Judge: The merchandise to which the instant protests relate consists of electrically welded steel tubes, imported in lengths of 155

inches or of 20 feet, ranging in diameters from ¾ to 1¼ inches, with wall thicknesses of either 16 or 18 gauge. This merchandise was classified by the collector of customs at the port of entry as steel tubes, within the provisions of paragraph 328 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802, or by the Annecy Protocol to the General Agreement on Tariffs and Trade, 84 Treas. Dec. 403, T. D. 52373, supplemented by T. D. 52462, and assessed with duty at the rate of ⅜ cent per pound, or of 12½ per centum ad valorem, respectively, according to wall thickness.

Plaintiffs claim by their several protests, consolidated for the purposes of trial, that the steel tubes in question are provided for in paragraph 312 of said act, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T. D. 52739, as all other structural shapes of iron or steel, which are dutiable at the rate of one-tenth of 1 cent per pound, if not assembled, manufactured, or advanced beyond hammering, rolling, or casting, or at the rate of 7½ per centum ad valorem, if assembled, manufactured, or otherwise advanced.

Insofar as here pertinent, these provisions read as follows:

Paragraph 328, as modified by T. D. 51802, *supra*:

Lap-welded, butt-welded, seamed, or jointed iron or steel tubes, pipes, flues, and stays, not thinner than sixty-five one-thousandths of one inch:

    If not less than three-eighths of one inch in diameter_____⅜¢ per lb.

Paragraph 328, as modified by T. D. 52373 and T. D. 52462, *supra*:

Finished or unfinished iron or steel tubes not specially provided for:

    \*     \*     \*     \*     \*     \*     \*

Other_____12½% ad val.

Paragraph 312, as modified by T. D. 52739, *supra*:

Beams, girders, joists, angles, channels, car-truck channels, tees, columns and posts, or parts or sections of columns and posts, and deck and bulb beams, together with all other structural shapes of iron or steel.

    Not assembled, manufactured or advanced beyond hammering, rolling, or casting_____ 0.1¢ per lb.

    Machined, drilled, punched, assembled, fitted, fabricated for use, or otherwise advanced beyond hammering, rolling, or casting_____ 7½% ad val.

Considerable testimony was adduced at the trial of this action, and numerous physical and documentary exhibits were received in evidence. In all, eight witnesses were called to testify, of whom five appeared on behalf of the plaintiffs and three for the defendant. No attempt will be made here to review their individual testimony in detail, as to do so would unnecessarily lengthen this opinion. How-

ever, we deem a recital of the qualifications of the various witnesses to be in order.

Plaintiffs' first witness was Jay Baron, a partner in the firm of Baron Tube Co., one of the plaintiffs herein, which has, since 1950, been engaged in the business of buying and selling imported tubing. This witness was personally familiar with the method of manufacture employed to produce the merchandise at bar, the customers to whom Baron Tube Co. sold said merchandise, and many of the uses to which the imported tubing and domestic merchandise of like character were applied.

Plaintiffs' witness Daniel Wheeler Turner was maintenance superintendent for Smokey Mountains Trailways, a passenger carrier operating a line of buses between Dallas, Tex., and New York City, and elsewhere, whose duties consist of maintaining the company's buses and equipment in good repair. In connection therewith, tubing like the merchandise at bar is used.

Gordon Bennett Dalrymple, who testified for plaintiffs, is a graduate civil engineer in structures from the University of Illinois, who has studied for his master's degree in the field of structural engineering at the Georgia Institute of Technology, and has also been an instructor at that institution. He is presently associated with the Law-Barrow-Agee Laboratories as professional engineer and secretary-treasurer. These laboratories are commercial testers of materials for construction in various cities throughout the South and Southeast, their principal office being in Atlanta, Ga. This witness is also secretary-treasurer of the Georgia section of the American Society of Civil Engineers.

Plaintiffs' witness James D. McGill is vice president and general manager of United Sheet Metal Co., Inc., a firm engaged in the business of general steel fabricating.

The last witness for plaintiffs was Steward A. Sparks, who holds a bachelor of science degree in Industrial Engineering from the Georgia Institute of Technology, is a member of the American Institute of Industrial Engineers, and is presently employed as an engineer by the firm of Potter & Rayhield, Inc., of Atlanta, Ga., which designs and builds access and other work stands as an incident of its primary operations, which consist of weldments.

Called to testify for the defendant were Hyman Baron, a partner in the Baron Tube Co., who was familiar with the nature of the business operations of the customers to whom his firm sold steel tubes; Robert McMasters, vice president in charge of all production of the Southeastern Metal Co., one of the largest fabricators of steel tubing in the United States, who was previously chief hull engineer for a shipyard; and Samuel Johnson, United States Treasury Department Customs Agent in Charge of Customs Agency Service District No. 6, which embraces the States of South Carolina, Georiga, and part of Florida.

It appears from the record that the merchandise at bar, cut samples of which are in evidence as plaintiffs' exhibits 1 (1″ by 18 gauge), 2 (⅞″ by 18 gauge), 3 (¾″ by 16 gauge) and 9 (1¼″ by 16 gauge), was produced in the following manner:

Steel in strips, hot rolled from steel billets, in widths determined by the diameters of the tubing desired, is passed over a series of rolls in a tube mill. The rolls gradually round the strips until the two edges are brought together. At that moment, an electric welding unit fuses the edges of the strips, thereby completing the tubing. Immediately behind the welding apparatus is a blade, which scrapes off the ridge formed by the welding operation, leaving a smooth, rounded tube, which is automatically cut to desired lengths by a flying cutoff.

This process of manufacture is basically the same as that employed in the United States.

A copy of a typical purchase order for steel tubing, addressed to the Belgian manufacturer of the instant merchandise, is in evidence as defendant's exhibit A. It calls for electrically welded steel tubing of stated diameter and gauge "manufactured from Hot Rolled Strip, with welded rim removed externally, giving an outside aspect perfectly smooth, with a slight trace of welding inside, suitable for chrome and nickel plating, unnealed [sic] commonly known as Furniture Grade, (approximate analysis SAE 1010 to 1020)" in specified lengths. Apparently, the word "unnealed" is a typist's error, as it has been affirmatively established that all of the merchandise imported by Baron Tube Co. was unannealed.

The evidence reveals that the letters SAE refer to the Society of Automotive Engineers, which sets standards analyses in the steel trade. SAE 1010 or 1020 is shown to be a mild steel, with specified percentages of carbon, manganese, phosphorus, and sulfur, generally known as low-carbon steel. The steel tubes supplied by the exporter, while not possessing all of the chemical properties within the limits prescribed for SAE 1010 steel, is a close approximation thereof.

It appears that two samples of the imported tubing, one designated as "Belgian" (7/8″ by 18 gauge), the other as "imported" (1″ by 18 gauge), together with a section of domestic tubing (3/4″ by 18 gauge), and a portion of tubing 1″ by 16 gauge, cut from a scaffold manufactured by the Safway Scaffolding Co., one of the largest scaffolding manufacturers in the country, were submitted to the Law-Barrow-Agee Laboratories, Inc., for testing and analysis. The report of the tests upon the materials submitted is in evidence as plaintiffs' collective exhibit 12

Commenting upon said tests, witness Dalrymple gave the following testimony.

Q. Now, did you ascertain with respect to each of these exhibits a test of their tensile strength known as the tensile test?—A. We did.

\*       \*       \*       \*       \*       \*       \*

Q. Now, what is the relationship of the test showing tensile strength, what is the relationship of that test to the use of the material as structural steel?—A. It gives the engineer a basis for design of members that are placed in tension.

Q. What is meant by the term "ultimate strength" as it appears in Exhibit 12?—A. That is a strength at which the material failed and is related to per inches of actual metal in the specimen.

Q. Is this a standard test in ascertaining the physical properties of structural steel?—A. It is.

Q. Now, what was the compression test, and what properties are indicated thereby?—A. The compression test is an attempt to determine in the laboratory the compressive strength of the particular material that we are testing. It is a pressing down from each phase or each end of the material in compression to simulate an actual or a similar type of loading in the structure.

Q. And is it related to the load that the steel will carry?—A. The compressive load that the steel can carry is related to this ultimate strength in compression.

Q. Now, you have here an item "elongation percentage." What is the relationship of the percentage of elongation to the use of the material as structural steel?—A. Elongation is very important feature in structural steel. It represents its ability to elongate before failure—well, to an engineer, it represents the ability of the structure to take certain dynamic loading without snapping quickly; it's actual amount of stretch that the material goes through before it ruptures.

Q. Is this property of elongation related to the ductility of the steel?—A. Sometimes used interchangeably.

Q. Wherein did the property of ductility is it important with respect to the material as structural steel?—A. It enables it to take certain shock loadings without failure.

\*       \*       \*       \*       \*       \*       \*

Q. Is the carbon content of the steel one of the elements considered by you in rendering an opinion with respect to the structural properties of the steel?—A. Yes, sir.

Q. What is the relationship of the carbon content to the use of the steel as structural steel?—A. The amount of carbon in a particular steel is very important on the particular grade that it falls within. In other words, it may be in a structural grade; it may be in some other type of grade; therefore, I have to know that content to see what grade I am dealing in.

Q. Referring now to the steel which you tested, described as Belgian steel ¾ inch diameter, referred to on page 12–A—Exhibit 12–A, what was the ultimate strength as you determined it?—A. The tension or what?

Q. In tension.—A. 75,850 pounds per square inch.

Q. And what was the failure load in tension?—A. 8,650 pounds.

Q. Now, referring to the same steel, what in the compression test was the failure load and what was the compression load?—A. Failure load, 8,170 pounds; the ultimate strength was 71,650 pounds per square inch.

\*       \*       \*       \*       \*       \*       \*

Q. Referring now to the merchandise described on 12–A as Belgian tubing, based upon the tests that you made, say whether or not in your opinion as an engineer the properties disclosed in these tests classify this material as a grade of structural steel.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

THE WITNESS: In my opinion, this Belgian tubing referred to in our test falls within the structural grade of material.

By MR. DONOHUE:

Q. Can you identify it as any particular grade of material?—A. To properly identify it, I must go back to the carbon analysis and use the carbon percentage, and place it within a particular class of carbon steel which puts it in a category of 1010 steel.

In the opinion of both engineers, who testified on behalf of the plaintiffs, these tests indicate that the imported tubing is comparable with tubing made of SAE 1010 steel, any variation in carbon, sulfur, manganese, or phosphorus content, not being significant, and is within the structural grade of material. Both experts expressed the view that, by reason of physical properties and tubular shape, the subject tubing would appropriately be described as a steel member designed to carry maximum loads and resist maximum forces with a minimum use of material.

The record establishes that Baron Tube Co. has sold merchandise of the kind herein involved throughout a large portion of the United States, particularly in the States of Georgia, Tennessee, Texas, Louisiana, Missouri, California, Illinois, New York, Indiana, Ohio, Pennsylvania, Kansas, and Maryland, as well as in Toronto, Canada. Because of the many uses of this material, it is offered for sale, primarily by sample, as electric welded steel tubing, with representations that it is comparable in analysis to American SAE 1010 and is suitable for bending. It is always sold by plaintiff company in straight lengths, but practically all of the users perform some bending operations to shape their individual products, and, frequently, sections of tubing, cut to specified lengths, are welded together. It is also sometimes further fabricated, punched, painted, or chromed.

Copies of invoices to some of the customers of Baron Tube Co. were offered in evidence by counsel for plaintiffs. Upon objection by Government counsel, a ruling upon the admissibility thereof was reserved for the full division, the papers being marked plaintiffs' collective exhibit 7 for identification. Upon due consideration and for the reason that we deem said invoices to be self-serving documents, the objection to the introduction in evidence of said exhibit 7 for identification is sustained.

The record reveals a great variety of uses for this kind of tubing, both imported and domestic, in equivalent diameters and gauges. It is used for the construction of television towers to support antennas

in rural areas; for A frames to hold cross-members for playground sets and ladders or from which to suspend swings and gliders; in scaffolding construction, as crossbracing for the upright members in tall structures and for the entire construction of smaller scaffolds, not more than 25 to 30 feet high, of the kind used for inside work; for the construction of platforms and so-called access stands for approaching, maintaining, and repairing airplanes and their equipment; in automotive construction for cross-member bracing, as well as for set frames; for the fusilages of gliders; for frames for the skull structures of buses and trucks; for small trusses in light prefabricated buildings; for furniture, especially dinette and garden furniture; for handles for lawn mowers and wheelbarrows, for bicycles and velocipedes; for charcoal grills; for frames for hanging on conveyors of moving parts through plants; for racks for moving materials; for oven racks; for frames for portable pumps and engines; for railings; and for countless other articles. Various photographs, pamphlets, sketches, and diagrams, illustrating some of these uses, are in evidence in this case.

While many of the aforementioned uses are shown to be substantial, the weight of the evidence supports a finding that, predominantly, this material is employed in the manufacture of frames for dinette and other steel furniture. The Southeastern Metal Co., one of the largest tubing manufacturers in the United States, of which defendant's witness McMasters is vice president, fabricates some 600,000 feet of tubing per week. At least 90 per centum of that production finds its way into the manufacture of dinette and other furniture with steel frames.

Nevertheless, it does appear that tubing is employed in substantial quantities for the manufacture of the other articles, hereinabove enumerated. For almost all of them it is so used because it will sustain the greatest load with the lightest and least amount of material. In scaffolding, tubing must support the weight of the workmen, their materials, and its own weight. In television towers, which are usually constructed from 1″ 18-gauge tubing, braced with crosspieces of flat steel, in triangular sections, the vertical members carry the weight of the structure and support the antenna, in sustaining bending loads, compressive loads, and possibly shear. When tubing is used in the superstructure of a bus, it must carry the weight of the body and of the skin, the weight of the tubing itself, the passenger load, the windload, and other dynamic and shock loadings.

It seems clear, from this record, that the tubing at bar has the capacities and shape to withstand the maximum loads and forces to which it would be subjected in any of these uses. In connection with plaintiffs' collective exhibit 14, a maintenance platform for servicing

the tail section of B–52 planes, constructed according to Air Force specifications, in part with tubing similar in diameter and gauge to the imported material, it was shown to have withstood the following test:

The test was Air Force requirement. It had been pulled for 20 miles over rough terrain. It had to be raised and lowered on a 100-cycle program. The top platform in the full extended position had to have 1,000 pounds of weight put over it, and in the extended position which is 43 feet in the air, the cable had to be cut and the cable dropped. That type of an actual test showing the end use of the product, being able to withstand the test, I believe, from a practical standpoint would answer your question.

Plaintiffs contend that the facts established by the instant record bring the merchandise at bar within the purview of the provision for "structural shapes," as that term has been judicially construed, and that, "structural shapes" being a more specific designation than "steel tubes," it should prevail. The leading customs cases involving this question, as well as several decisions of tribunals of other jurisdictions, have been cited to us in support of the contention that the merchandise herein involved consists of structural shapes and that many of the articles into which the tubing has been fabricated are structures.

It is further contended that the tubing has not been assembled, manufactured, or advanced beyond hammering, rolling, or casting and, hence, that the lower rate specified in said paragraph 312, as modified, *supra*, should be applied.

Counsel for the Government urges that the imported merchandise should not be considered to be structural shapes, for the reason that it is mere material, not an article ready for use in its condition as imported. Further, it is argued that, since the tubing is ordered as suitable for chrome and nickelplating, and of a grade commonly known as "furniture grade," it is not "designed primarily to carry forces and loads." Defendant also maintains that welding is an advancement beyond hammering, rolling, or casting, and, in the event that paragraph 312 is found to provide for the merchandise at bar, the higher rate therein provided should be applied.

Generally speaking, the courts have construed the term "structural shapes" in accordance with prevailing lexicographic authorities as referring to the shape of a member "having the capacity to sustain [relatively] heavy weights or to resist great tension or both, and designed for the utilization of such capacity." *Judson Freight Forwarding Co.* v. *United States*, 20 C. C. P. A. (Customs) 229, T. D. 46038. Otherwise, the phrase has been defined as the shape of a member especially adapted to structural purposes, especially in giving the greatest strength with the least material, or weight, this being in substance the definition of the term in Webster's New International

Dictionary (1925), cited with approval in the case of *United States* v. *Frank*, 15 Ct. Cust. Appls. 97, T. D. 42184.

While it has been repeatedly held that no comprehensive definition of the term could be supplied so as to establish a rule of thumb for the classification of every item claimed to be a structural shape, nevertheless, it has been suggested that deductions may be drawn from decided cases to serve as a guide for resolving the issue in any particular instance. *United States* v. *Henry L. Exstein Co., Inc.*, 16 Ct. Cust. Appls. 328, T. D. 43079; *Otis McAllister & Co.* v. *United States*, 27 C. C. P. A. (Customs) 4, C. A. D. 52; *The Frost Railway Supply Co.* v. *United States*, 39 C. C. P. A. 90, C. A. D. 469; *The Winkler-Koch Engineering Company* v. *United States*, 30 Cust. Ct. 26, C. D. 1494, affirmed, *United States* v. *The Winkler-Koch Engineering Co.*, 41 C. C. P. A. (Customs) 121, C. A. D. 540.

Applying this precept, we find the case of *Judson Freight Forwarding Co.* v. *United States*, *supra*, to have an important bearing upon the issue here to be determined. The subject of decision therein was small steel angles, which were claimed to be *eo nomine* provided for in paragraph 312 of the Tariff Act of 1922, the structural shapes provision of that act. In opposing this claim and seeking to sustain the collector's classification of the merchandise within paragraph 304 of said act, as steel, not specially provided for, counsel for the Government urged that the provisions of said paragraph 312 were confined to such articles as were "exclusively *used as structural shapes*" [italics quoted] and were definitely dedicated to such use and, hence, that small angles and other small shapes were not intended to be covered by the provision.

With respect to the use of said angles, the decision recites:

It clearly appears from the record that the involved angles or small shapes are used substantially for structural purposes in ceilings, walls, and partitions in buildings; as "tieings or anchors to keep a building from spreading"; for "building up joists"; as "steel trusses, roof trusses," in garages, factories, and "over courts in hotels"; in the construction of columns, posts, and in—

skylight construction and roof purlins for supporting the tile roofing, and in the bracing of latticed members, columns, sidewalks, supporting greenhouse construction, elevator guides;

in the framework of pump houses and other like structures; in the construction of oil tanks; in oil-well derricks, ranging from 15 feet to 115 feet in height; in the making of booms for traveling cranes; and also in the manufacture of agricultural implements, road and grading machinery, hoisting and conveying machines, fences, safes, automobiles, bedsteads, and in a variety of other articles requiring light sections.

In holding that the involved angles were within the common meaning of the terms "angles" and "structural shapes," the court relied upon the dictionary definitions thereof, as well as the following report, taken from the Summary of Tariff Information, 1920:

*Description and uses.*—*Structural shapes* are iron or steel rolled for structural purposes. They are classified into heavy and light—the latter being those with the leg or web less than 3 inches—and are given commercial names, e. g., I-beams, channels, joists, girders, angles, tees, and zees, names largely descriptive of their cross-section appearance. Nearly 90 per cent of the country's production are heavy structural shapes. They are used in buildings, bridges, ships, cars, etc. Light shapes are used in the manufacture of agricultural implements, bedsteads, fences, safes, automobiles, and other articles requiring light sections.

The court then stated:

The Congress was informed by the Tariff Commission that similar provisions contained in paragraph 104 of the act of 1913 had been construed by the courts to apply to shapes used in structures other than buildings, ships, and similar erections, and that wrought-iron bars for roofs and skylights, ornamental iron-work representing leaves and other decorations, and steel bars or grates used in the construction of a brewery-mash filter, were included within the provisions of that paragraph. Furthermore, the Tariff Commission stated in its report that *structural shapes, rolled for structural purposes,* included not only the heavy but the light shapes; that the light shapes were those with legs or webs less than three inches; that both the heavy and the light shapes had commercial names, such as "I-beams, channels, joists, girders, angles, tees, and zees"; that such names were largely descriptive of their cross-section appearance; that the large structural shapes were used in buildings, ships, bridges, cars, etc.; and that the light structural shapes were used in the manufacture of—

agricultural implements, bedsteads, fences, safes, automobiles, and other articles requiring light sections.

\*　　\*　　\*　　\*　　\*　　\*　　\*

It has been fully established that the involved articles—steel angles—have the capacity to sustain relatively heavy weights and to resist great tension, and that they are designed to be, and are, used as "structural shapes" in buildings, derricks, and other structures requiring light sections.　\*　\*　\*

It is to be noted that the doctrine of chief use as an element in determining the scope of the term "structural shapes" was specifically repudiated, and that the court's decision rested upon the factual finding that "the involved articles—steel angles—have the capacity to sustain relatively heavy weights and to resist great tension, and that they are designed to be, and are, used as 'structural shapes' in buildings, derricks, and other structures requiring light sections."

At this juncture, we deem it appropriate to observe that, whereas the evidence introduced by the defendant herein tended to establish the fact that tubing, such as we have here, is primarily used in the manufacture of dinette and other steel furniture, it is not gainsaid by this record that the imported merchandise has the capacity to sustain comparatively heavy weights, both in tension and compression, and to resist windloads and other forces, with a minimum use of material. Neither is there evidence to controvert the facts, established by competent and qualified witnesses, that the cylindrical shape of the article bears upon its capacity to perform these functions and that this material is substantially lighter than other steel material, which might be used for the same purpose.

It needs no elaborate discussion to support the conclusion that television towers, scaffolds, platforms, and access stands, of the kind here shown to be constructed in whole or in part of tubing like the imported merchandise, are structures within the common meaning of that term. A structure is defined in Funk & Wagnalls New Standard Dictionary of the English Language (1942) as:

That which is constructed; a combination of related parts, as a machine, a building, or a bridge.

The term "structure" has been construed to include an oil-well derrick, *Showalter* v. *Lowndes*, 49 S. D. 448; a movable derrick, *Stevens* v. *Stanton Construction Co.*, 137 N. Y. S. 1024; an electric power line, *Western Electric Co.* v. *Cooley*, 251 Pac. 331; and a platform used by workmen to erect or repair a building, *Most* v. *Goebel Construction Co.*, 203 S. W. 474.

Moreover, inasmuch as the tubing is ordered to conform approximately to the analysis for SAE 1010 to 1020 steel, which is here shown to be of a structural grade, it cannot be said that it is not "designed, primarily to carry forces and loads," merely because it is also described as "commonly known as Furniture Grade." The fact is that the instant tubing is adapted for structural uses and is so used to a substantial extent. Chief use not being a criterion, the fact of predominant use in the manufacture of furniture is immaterial.

Adverting now to the contention that the tubing in issue is mere material, and not an article ready for use in its imported condition, and, therefore, is not "structural shapes," certain observations in the case of *United States* v. *Henry L. Exstein Co., Inc., supra,* are considered to be of particular pertinency. That case involved a claim for classification as structural shapes, within paragraph 312 of the Tariff Act of 1922, of deformed steel bars, used for reinforcing concrete. It there appeared that, when used to strengthen concrete, the ends of the bars were bent by workmen, on the construction job, to facilitate anchoring to the wall columns of the building. The court there stated:

It is argued that these deformed bars are bought and sold in bulk, as other building materials, are not required to be fabricated to fit any particular job, and should hence be treated as materials. The same might be said of the other steel products mentioned in said paragraph 312. It will be observed that the paragraph levies a certain rate of duty upon said products when not "assembled, manufactured, or advanced beyond hammering, rolling, or casting," and a higher rate when "machined, drilled, punched, assembled, fitted, fabricated for use, or otherwise advanced beyond hammering, rolling, or casting." Obviously, these materials may be and no doubt are imported into this country in bulk, as stock goods, not at all ready for their final use. What does the statute mean, for example, when it says "fabricated for use?" Plainly, that there may be such products, covered by this paragraph, which are not fabricated for use. It is well within reason that I beams, for instance, may be ordered from stock and be

punched, fitted, and assembled on a construction job. If so, wherein does this differ from a reinforcing bar, which must be fitted for its use by, possibly, cutting or having its ends turned over? No difference, in effect, is apparent. If a steel product is used as a structural shape of steel, it is not removed from that classification because it requires fitting and fabricating to a degree before it is used.

Paragraph 312 in its present form likewise provides for structural shapes, not "assembled, manufactured or advanced beyond hammering, rolling, or casting," as well as when "machined, drilled, punched, assembled, fitted, fabricated for use, or otherwise advanced beyond hammering, rolling, or casting." It is the quality of the steel, its diameter and gauge, and the cylindrical form which impart to this tubing its ability to sustain relatively heavy weights and to resist great tension. These elements are acquired when the tubing is produced in the mill and are inherent in its condition as imported. Every use to which this tubing is applied in this country rests upon these characteristics, notwithstanding the fact that bending may modify the form to some extent. The imported article is not material used in the formation of structural shapes. It is, as imported, structural shapes, despite the fact that it may require further fabricating before becoming adapted to any specific use.

We are of opinion, however, that the welding operation which fuses the edges of the steel strips is an advancement within the contemplation of the provision in question. The tubular shape of the article is created by the rolling process, which rounds the strip until the edges meet. At that point, the steel strip becomes a steel tube. A further manufacturing operation is necessary to produce electrically welded steel tubing, but that process is a step beyond the specific processes of hammering, rolling, or casting.

This record is barren of any evidence to show that unwelded steel tubing lacks the capacity to sustain heavy weights or resist great tensions, or that, until the welding operation has been performed, the material is something less than structural shapes. It has not been here established that unwelded steel tubing has not acquired the status of structural shapes, or that the welding process is essential to the creation of the article into the form and character of a structural shape.

When the phrase "not assembled, manufactured or advanced beyond hammering, rolling, or casting" is read in conjunction with the phrase "machined, drilled, punched, assembled, fitted, fabricated for use, or otherwise advanced beyond hammering, rolling, or casting," the intendment of the lower rate provision becomes plain. The crudest steps of formation are all that are encompassed. Anything more is clearly an advancement, and the higher rate attaches.

Based upon the foregoing considerations, we find and hold that the electrically welded steel tubing here involved consists of structural shapes, advanced beyond hammering, rolling, or casting, within the

purview of paragraph 312 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, *supra*, which are dutiable at the rate of 7½ per centum ad valorem. The claim in the protests to that effect is sustained. All other claims are, however, overruled.

Judgment will be entered accordingly.

OPINION CONCURRING IN PART AND DISSENTING IN PART

LAWRENCE, Judge: I concur with the foregoing decision of my associates insofar as the majority holds that the merchandise at bar consists of structural shapes.

However, I am of the opinion that, in its condition as imported, the merchandise has not been advanced beyond hammering, rolling, or casting, and that, as a matter of fact, it did not assume the status of structural shapes until the welding process had been completed. It is my view, therefore, that the proper rate of duty applicable thereto, pursuant to the provisions of paragraph 312 of the tariff act, as modified, *supra*, is one-tenth of 1 cent per pound.