(C.D. 2059)

BARON TUBE Co.
JOHN S. JAMES } *v.* UNITED STATES

United States Customs Court, Second Division

(Decided on rehearing [C. D. 1910] December 24, 1958)

*Sharretts, Paley & Carter* (*Joseph F. Donohue* of counsel) for the plaintiffs.
*George Cochran Doub,* Assistant Attorney General (*Dorothy C. Bennett, Joseph E. Weil,* and *Alfred A. Taylor, Jr.,* trial attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

RAO, Judge: On August 22, 1957, a decision and judgment were rendered herein, Lawrence, J., dissenting in part (39 Cust. Ct. 85, C. D. 1910), holding certain imported steel tubes to be dutiable at the rate of 7½ per centum ad valorem, within the provisions of paragraph 312 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T. D. 52739, for all other structural shapes of iron or steel, advanced beyond hammering, rolling, or casting, as alternatively claimed by plaintiffs.

Both parties thereupon moved for a rehearing of the issues involved in the case. On behalf of plaintiffs, it was urged that the judgment be set aside and an opportunity be afforded for the introduction of additional evidence in support of the additional claim in the protests for classification of said tubes as structural shapes of iron or steel, not advanced beyond hammering, rolling, or casting, with the consequent assessment of duty at the rate of one-tenth of 1 cent per pound, as provided in said paragraph 312, as modified, *supra.*

Defendant's motion, in substance, requested a reconsideration of the basic issue of whether the involved steel tubes were, in fact, structural shapes, within any portion of said paragraph 312, as modified, for the reason that the evidence showed said tubes to be, at most, material for making structural shapes, and not structural shapes *per se.* It was also urged, from a consideration of the tariff history preceding the enactment of paragraph 328 of the Tariff Act of 1930, which paragraph was invoked by the collector in classifying the instant merchandise as steel tubes, that Congress had intended said paragraph 328 to be construed so as to include the tubes at bar.

On November 6, 1957, an order was entered setting aside said judgment and restoring the case to the calendar for all purposes.

The record as originally made established that the merchandise at issue consisted of electrically welded steel tubing, in sizes of 1″ by 18 gauge, ⅞″ by 18 gauge, ¾″ by 16 gauge, and 1¼″ by 16 gauge, represented by plaintiffs' exhibits 1, 2, 3, and 9, respectively. The steel of which the tubing was composed, described as the equivalent of SAE 1010 or 1020, was shown to be a low carbon, mild steel, containing specified percentages of carbon, manganese, phosphorous, and sulfur.

From the evidence, we found that the tubing was produced in the following manner:

Steel in strips, hot rolled from steel billets, in widths determined by the diameters of the tubing desired, is passed over a series of rolls in a tube mill. The rolls gradually round the strips until the two edges are brought together. At that moment, an electric welding unit fuses the edges of the strips, thereby completing the tubing. Immediately behind the welding apparatus is a blade, which scrapes off the ridge formed by the welding operation, leaving a smooth, rounded tube, which is automatically cut to desired lengths by a flying cutoff.

It was further established by highly competent witnesses, whose testimony was based in part upon tests of the tubing made to determine strength factors, that "by reason of physical properties and tubular shape, the subject tubing would appropriately be described as a steel member designed to carry maximum loads and resist maximum forces with a minimum use of material."

Many of the uses for which this tubing is adapted were set forth in our original decision and need not be repeated here. It was our opinion that for most, if not all, of them, as for example in the formation of such structures as television towers, scaffolds, platforms, and access stands, tubing was employed because of its capacity to sustain heavy loads and withstand great tensions, with a minimum amount of material. Predicated upon a consideration of many prior decisions construing tariff provisions for structural shapes, particularly the cases of *Judson Freight Forwarding Co.* v. *United States*, 20 C. C. P. A. (Customs) 229, T. D. 46038; *United States* v. *Frank*, 15 Ct. Cust. Appls. 97, T. D. 42184; and *United States* v. *Henry L. Exstein Co., Inc.*, 16 Ct. Cust. Appls. 328, T. D. 43079, as well as lexicographical and judicial interpretations of the term "structures," we held the instant tubing to be structural shapes within the contemplation of paragraph 312, as modified, *supra*. In so doing, we also concluded that, inasmuch as such tubing had a substantial use in the formation of structures, it was immaterial that the record showed a predominant use in the manufacture of dinette and other steel furniture. We further rejected, as untenable, the argument of counsel for defendant that since much of the tubing is subjected to bending operations prior to ultimate use, it is, as imported, not structural shapes, but, at best, structural steel to be converted into structural shapes.

We are not persuaded by any additional arguments now advanced by defendant, but not supported by supplementary proof, that our conclusions in these respects were in error.

Concerning the alternative classifications for structural shapes provided in paragraph 312, as modified, *supra*, to wit, "Not assembled, manufactured or advanced beyond hammering, rolling or casting," as against "Machined, drilled, punched, assembled, fitted, fabricated for use, or otherwise advanced beyond hammering, rolling, or casting," we held as follows:

We are of opinion, however, that the welding operation which fuses the edges of the steel strips is an advancement within the contemplation of the provision

in question. The tubular shape of the article is created by the rolling process, which rounds the strip until the edges meet. At that point, the steel strip becomes a steel tube. A further manufacturing operation is necessary to produce electrically welded steel tubing, but that process is a step beyond the specific processes of hammering, rolling, or casting.

This record is barren of any evidence to show that unwelded steel tubing lacks the capacity to sustain heavy weights or resist great tensions, or that, until the welding operation has been performed, the material is something less than structural shapes. It has not been here established that unwelded steel tubing has not acquired the status of structural shapes, or that the welding process is essential to the creation of the article into the form and character of a structural shape.

When the phrase "not assembled, manufactured or advanced beyond hammering, rolling, or casting" is read in conjunction with the phrase "machined, drilled, punched, assembled, fitted, fabricated for use, or otherwise advanced beyond hammering, rolling, or casting," the intendment of the lower rate provision becomes plain. The crudest steps of formation are all that are encompassed. Anything more is clearly an advancement, and the higher rate attaches.

It was on this phase of the case that Judge Lawrence expressed his dissent, it being his opinion that the merchandise "did not assume the status of structural shapes until the welding process had been completed."

The record as presently constituted supplies in abundance the evidence the majority found wanting upon the first submission of this case. Two well-qualified witnesses, one, a manufacturer and distributor of steel tubing, with 42 years of experience in that line, the other, a consulting engineer, licensed in the States of New York and Ohio, who has spent the major portion of his working life in the business of manufacturing tubing and tube fabricating equipment, gave testimony to the effect that, prior to welding, steel tubing, if it may be appropriately so called, lacks the necessary strength to subserve any structural purposes. Both had observed the testing of unwelded and welded tubular shapes of 20-gauge steel, of the same grade as the merchandise at bar, under hydraulic pressures applied to determine various strength factors, with the following results:

The unwelded material became distorted after bending. On the first bending, one edge spread open and overlapped the other; on the second bending, both edges curled inwardly. The welded piece showed neither breakage at the weld nor any collapse of the wall.

Upon being subjected to a vertical compression load, the unwelded or so-called butted tube collapsed completely, spreading, distorting, and creasing, whereas the strength of the welded piece showed no failure, although some creasing, indicating the ductility and strength of the steel, occurred.

With the application of perpendicular force to determine the strength of the tubes as structural members in horizontal positions, the unwelded section completely collapsed at 400 pounds' pressure

by spreading at the seam and creasing. The welded section retained practically all of its structural strength under approximately 700 pounds of pressure.

Similar failures occurred in the unwelded material under tests for determining its ability to support vertical loads, whereas like tests of the welded tube showed no evidence of failure or rupture of any kind.

By way of illustration of these results, there were introduced into evidence as plaintiffs' exhibits 19 through 28, the various sections of steel tubing upon which said tests were made. There is also testimony to the effect that while 20-gauge steel is lighter than 16- or 18-gauge steel, of which the merchandise at bar is composed, the same results would ensue, if comparable welded and unwelded tubing of such gauges were similarly tested. Plaintiffs' exhibits 29 and 30 are pieces of 16-gauge material, not welded, which show the results caused by bending.

Both witnesses expressed the view that the strength factors for which the materials were tested are essential characteristics of structural steel, to enable it to carry and distribute structural loads. In their opinion, before welding, tubular steel lacks requisite strength for any structural purpose, and is useful only for ornamental trimmings as on bedsteads, or in the manufacture of such articles as the barrels of children's rifles. The strength of tubular steel derives almost completely from its continuous circular wall, the continuity being achieved by welding, and "there is no better material for structural uses than tubing."

It further appears from the additional evidence now before us that the welding of the imported tubing is part of the formation process. As stated by the witness Wanderman:

* * * At the point of the last roll, which forms it [the steel strip] close together, heat is applied, in the form of electrical electrodes, which fuses the two together simultaneously with the last bit of rolling and causes the completion of the manufacture of the tube.

     *       *       *       *       *       *       *

That is the welding, that causes the welding, the fusing. There is no added metal, which you may think of in welding, adding some added metal. This is merely heating, which adds, fuses it. There is no additional metal nor is there any additional processing.

It now seems clear that until steel in tubular form is welded, it lacks the essential characteristics of structural shapes. It does not have the capacity, required of such articles, to sustain loads or withstand tensions. The tendency of such steel to distort under pressures demonstrates that it could not be used in the formation of structures.

The process which makes tubular steel into structural shapes is the formation of the continuous wall, which is accomplished by

welding. If prior to welding a section of tubular steel is not a structural shape, but it becomes such only after welding, it can not be said that the welding is an assembling, manufacturing, or advancement within the contemplation of the statute. No step in the creation of an article is at the same time an advancement of the article.

Based upon the evidence now before us, we find and hold that the steel tubing covered by the instant protests consists of structural shapes, not advanced beyond rolling, which are dutiable at the rate of one-tenth of 1 cent per pound, as provided in paragraph 328 of the Tariff Act of 1930, as modified, *supra*. The claim in the protests to that effect is, therefore, sustained.

Judgment will be entered accordingly.